**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America ex rel. | ) | |
| JAMES THIVEL | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 13 C 5908 |
| | ) | |
| RICK HARRINGTON, Warden, Menard | ) | |
| Correctional Center, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Petitioner James Thivel's petition for a writ of habeas corpus under

28 U.S.C. § 2254(d), challenging his 2001 convictions for first-degree murder. For the following

reasons, the Court denies Thivel's habeas petition and declines to certify any issues for appeal.

## I.     FACTS[1]

After a jury trial in 1999, James Thivel was convicted of first degree murder for the

shooting deaths of Robert Farberger and Eva Caudell, and sentenced to natural life

imprisonment. *People v. Thivel*, No. 1-01-2905, slip op. at 1 (Ill. App. Ct. Nov. 10, 2003), Dkt.

17 (State's Ex. A) ("Nov. 10, 2003 Op.").

---

[1] Thivel does not present clear and convincing evidence challenging the statement of
facts in the last state court decision to address his arguments on the merits, which is the Illinois
Appellate Court's opinion on post-conviction appeal. *See* 28 U.S.C. § 2254(e)(1); *McCarthy v.
Pollard*, 656 F.3d 478, 483 (7th Cir. 2011). The Court therefore adopts the underlying facts as
set forth by the Illinois Appellate Court in *People v. Thivel*, No. 99 CR 21313 (Ill. App. Ct. May
7, 2010), attached to the respondent's Motion to Dismiss as Exhibit G. That decision references
the more complete narrative of facts that is set forth in the Illinois Appellate Court's decision on
direct appeal, which will also be a source of facts. *See People v. Thivel*, No. 99 CR 21313 (Ill.
App. Ct. Nov. 10, 2003), attached to the respondent's Motion to Dismiss as Exhibit A. Where
necessary, the Court has incorporated excerpts from the trial transcripts, as well.

The evidence at trial reflected the following facts, which, given the breadth of relevant details, are presented in summary only and loosely organized by witness and topic.

***The Crime Scene***: At approximately 2:30 a.m. on the morning of January 10, 1996, Officer Gerald Loconsole of the Des Plaines Police Department discovered the bodies of Farberger and Caudell in a small red car parked near the intersection of Prairie Avenue and Potter Road in Des Plaines, Illinois. Nov. 10, 2003 Op. at 3. Caudell, who was 22 years old at the time, was seated in the driver's seat and had suffered five gunshot wounds to the head, left shoulder, neck, and left forearm. *Id.* Farberger, who was 24 years old, was in the front passenger's seat with four gunshot wounds to the back of his head. *Id.*

There was light snow on the ground that evening and tracks in the snow appeared to lead from the right rear door of the vehicle to a nearby tree, where snow stained with urine was discovered. *Id.* at 4. The footprints led back to the car and also away again from the car's right rear door, eastbound on Prairie Avenue, across Prairie, into a creek, up an embankment, into the front yard of 680 Potter Drive, away from 680 Potter Drive on a driveway and toward Seminary where they apparently ended. *Id.*; Dkt. 24, Ex. FF(3) at 671.[2] Footprints were also found on a nearby bridge in a pattern of two or three northbound and southbound passes; those prints appeared to lead away from the bridge and ended next to tire tracks, which matched the tires on the victims' car. Nov. 10, 2003 Op. at 4.

***680 Potter***: Near the corner of Prairie Avenue and Potter Road, where Caudell and Farbgerer's bodies were found, was a house at the address 680 Potter Road. At the time of Caudell and Farberger's deaths, 680 Potter was the residence of four individuals: Jeff Johansen, Daniel Stryjak, Joseph Czarnik, and John Dietzler. *Id.* at 5. At trial, Stryjak testified that he had

---

[2] All subsequent references to Ex. FF are located at Dkt. 24 on this Court's docket.

been friends with Thivel since high school and that Thivel and Farberger frequently visited 680 Potter to socialize and to sell and purchase marijuana. *Id.*; Ex. FF(4) (Tr.) at 1341-42. Stryjak added that Caudell occasionally came to 680 Potter accompanied by Farberger and sometimes Thivel, arriving in a red Chevy or Geo. Ex. FF(4) (Tr.) at 1343. On the night of January 9, Thivel's Dodge Omni, which was not operable at the time, was parked in the driveway of 680 Potter, though the record does not explain why or how Thivel's inoperable car came to be there or for how long it had been there. Nov. 10, 2003 Op. at 5.

*Thivel's Apartment and His Mother's House*: In January 1996, Thivel lived in an apartment at 400 Manda Drive in Wheeling, Illinois, which is between 10.7 and 12.8 miles from the location where Caudell and Farberger's bodies were found, depending on the route taken. *Id.* at 5. Thivel shared the apartment with Shane Murray. *Id.* at 6. The defense theory at trial was that Thivel was at his apartment in Wheeling the entire night of Farberger and Caudell's deaths. Thivel's brother Jeffrey lived at their mother's house, which was located at 8853C Robin Drive in Des Plaines, less than one mile from the location where the bodies were found. *Id.* at 5.

*Thivel's Relationship with the Victims:* Testimony at trial indicated that Thivel knew both victims (the three were often seen together), that Caudell and Farberger were romantically involved, and that Thivel and Farberger were friends and were known to deal marijuana together. Ex. FF(4) (Tr.) at 1353; *Id.* at 1168. Justin Milici, a friend of Thivel, testified that Thivel often helped Farberger; "Rob didn't have a place to stay and [Thivel] had Rob stay at his house despite his mother's objections … If Rob didn't have pocket money, he needed gas money, he needed whatever, and he said, hey, can you give me a few bucks, he always did. If he was hungry, he'd give him a meal. They were good friends." Ex. FF(4) (Tr.) at 1004.

***Thivel's Suspicions About the Theft of His Favorite Gun:*** Milici testified that "sometime within three weeks prior" to the victims' deaths, Thivel called Milici and told him that his "357 Magnum" was missing and that Thivel believed Farberger had taken it. Nov. 10, 2003 Op. at 6; Ex. FF(4) (Tr.) at 941. Milici further testified that a few days later Thivel told him that "He had fantasized a scene from the movie Reservoir Dogs where the person in the movie is tied to a chair and gasoline is poured all over them. And he fantasized about how much fun it would be to reap revenge on somebody who had done him wrong." Nov. 10, 2003 (Tr.) at 6. Milici added that Thivel told him that Farberger "must think [I'm] a fucking idiot if [I] wouldn't figure out that [Farberger] was the one who had stolen the weapon" and that he was also upset with Farberger because Thivel had given him $1,200 to pay restitution. *Id.* The State's theory was that Thivel's anger at Farberger was motivated by the fact that Thivel had "essentially been carrying Farberger" in the months leading up to the murders. *See* Ex. FF(6) (Tr.) at 2064. Thivel's roommate, Shane Murray, also testified that Thivel told him that he thought that Farberger had taken a gun from him, stating: "What does [Farberger] think; I am stupid? I am not. I know he did it. I am going to get him for that." *Id.*; Ex. FF(4) (Tr.) at 1170-71. Murray added that Thivel was referring to his "favorite gun," which he kept in a safe in his bedroom. Ex. FF(4) (Tr.) at 1171.

***January 8, 1996—The Day Before the Murders:*** On the day before Farberger and Caudell were murdered, Johansen, one of the residents at 680 Potter, asked Stryjak, another resident, to go to Thivel's apartment to collect some money that Thivel owed Johansen and to get some marijuana from Thivel. Nov. 10, 2003 Op. at 6. When Stryjak arrived at Thivel's apartment (with his roommate Dietzler and a female friend), Stryjak testified, Thivel appeared nervous and seemed to be waiting for someone. *Id.*; Ex. FF(4) (Tr.) at 1345, 1356. During the visit, Thivel

and Stryjak spoke alone in Thivel's bedroom; Thivel told Stryjak that Farberger "had ripped him off," stealing money and his 357 Magnum, "and that he was going to get his or he was going to, you know, kick his ass." *Id.* at 6-7; Ex. FF(4) (Tr.) at 1345. After Stryjak returned to 680 Potter, Farberger stopped by and said that he was looking for Thivel. Stryjak told Farberger, apparently in response to a question from Farberger about whether Thivel left something for him there, "He didn't leave anything for you. He hasn't been by."   Nov. 10, 2003 Op. at 7.

*January 9-10, 1996—The Evening of the Murders*: On the afternoon of January 9, Murray picked up Thivel at work, and along with two female friends, the four drank Captain Morgan rum and smoked marijuana together for much of the evening at Thivel's and Murray's apartment. Ex. FF(4) (Tr.) at 1173-75.

Beginning at around 8 p.m., several phone and in-person conversations occurred between Stryjak, Farberger, and Thivel. Farberger again went to 680 Potter; Stryjak asked him why he was there, again telling him, "No, Jim is not here. There's nothing here for you. I don't know why he told you to come here." *Id.*; Ex. FF(4) (Tr.) at 1347. One hour later, Thivel called Stryjak and told him that he "was going to come by. I said okay. And I asked him, you know, why did Rob stop by … [He said] he would explain [] what was going on when he came over." Nov. 10, 2003 Op. at 7; Ex. FF(4) (Tr.) at 1348. Approximately two hours later, Stryjak received a call from Farberger, who was still "looking for Jim." Ex. FF(4) (Tr.) at 1348. Stryjak also received another call from Thivel, who again told Stryjak that "he was coming over and he would explain to me what was going on when he came over." *Id.* at 1349. Stryjak told Thivel that he "didn't want that guy [Farberger] around here," and asked Thivel why he told Farberger to come by, to which Thivel responded, "I'll talk to you when I get over." *Id.*

At some point during the evening, Farberger also buzzed for entry at Thivel's and Murray's apartment in Wheeling, where Thivel and Murray were still drinking and smoking marijuana. *Id.* Thivel asked Murray to tell Farberger that he was not home, but Farberger continued to buzz. *Id.* Later, Farberger followed two of Murray's sisters, who also buzzed for entry, into the apartment. *Id.* at 7-8. Thivel went into his bedroom and closed the door before the sisters and Farberger entered the apartment; it is unclear from trial testimony whether Thivel knew Farberger was following the sisters into the apartment. *Id.* at 8; Ex. FF(4) (Tr.) at 1179. Murray again told Farberger that Thivel was not there, but, Murray testified, Farberger "made a kind of line towards [Thivel's] room and opened the door." *Id.* Thivel came out, pretending he had been sleeping. *Id.* At some point, Caudell also arrived and one of the sisters and Farberger went downstairs to let her in. Nov. 10, 2003 Op. at 8.[3] Murray testified on cross examination that he was "very intoxicated" and high from marijuana that evening. Ex. FF(4) (Tr.) at 1224.

***The Tow Truck Driver***: On the night of the murders, Raymond Felkel was working as a relief tow truck driver for Dave's Towing. *Id.* at 9. Felkel testified that at approximately 1:00 a.m. on January 10, 1996, he received a call for a tow needed at the corner of Potter and Seminary in Des Plaines—one block from Potter and Prairie, where the two bodies were found. *Id.* Evidence at trial indicated that the call to Dave's Towing was made from Thivel's mother's home. *Id.* When Felkel arrived at the corner, there were two or three people waiting for him. Felkel spoke primarily to one individual, who he described as smaller in stature and younger than himself (Felkel was 31 at the time; Thivel was 24 or 25). *Id.* Felkel testified that the individual was dressed for winter, wearing a hat and possibly gloves, and wore "plastic framed, slightly

---

[3] Caudell's sister testified that on the day of the murders, she learned from Caudell that Caudell and Farberger were going to spend the evening with Thivel and were going to visit Farberger's brother the following day. Nov. 10, 2003 Op. at 7; Ex. FF(2) (Tr.) at 602.

larger than average" glasses, a description consistent with the style of glasses that Thivel wore during the trial. *Id.* at 9-11. The individual directed Felkel to a mid-1980s style Nissan sports car parked "maybe a hundred feet" from the corner of Potter and Seminary, and asked Felkel to jump start the car.[4] *Id.* at 10. Felkel was unable to start the car, so the individual asked that Felkel tow the car, but to first jump start a van parked nearby, which Felkel did.[5] *Id.* The individual then asked Felkel to tow the car to another location, which was Thivel's mother's home. *Id.* When Felkel did as asked, the individual told him that he would run inside to get money from "his mom or dad or parents." *Id.* The individual then paid Felkel and said he did not want a receipt. *Id.* During the investigation of the murders, Felkel was unable to definitively identify in photographs the car, the van, or the individual who requested the tow, which he explained was because the individual wore winter clothes. *Id.* at 11. Felkel also did not identify Thivel at trial as the individual whose car he towed, and he admitted that he had not described the individual as wearing glasses to the police. *Id.* In closing, however, the defense conceded that Thivel matched Felkel's description.[6] *Id.*

---

[4] According to testimony at trial, Thivel's brother, Jeffrey Thivel, owned an 8008 Nissan X200, two-door hatchback that was having battery trouble. *Id.* at 19-20.

[5] Shane Murray, Thivel's roommate, owned a Chevy van at the time. Murray testified that Thivel told him the morning after the murders that he had borrowed Murray's van "to start his brother's car, and he put gas in it." Ex. FF(4) (Tr.) at 1173, 1185.

[6] Felkel testified that he remembered this particular tow because he had played a joke on a friend in that area by towing his friend's car during a party and because the owner of Dave's Towing sold the company later that year. *Id.* at 11-12. Felkel admitted, however, that he previously mistakenly stated that the party he referenced was six months before the January 1996 tow, when in fact the party occurred in May 1994. *Id.* at 12. Felkel apparently confused two parties. *Id.* Felkel's boss at Dave's Towing, David Becker, testified that in April 1999, the police asked him for records regarding the January 1996 tow but that the records had been destroyed. *Id.*

***Discovery of the Victims***: Officer Gerald Loconsole of the Des Plaines Police Department testified that while on patrol on January 9 and 10, 1996, at 12:58 a.m., he turned onto Prairie from Potter and "noticed a small red vehicle parked on the south side of the street about 20 feet off the roadway with the engine running." Nov. 10, 2003 Op. at 8.[7] He heard music coming from inside, shined a flashlight into the car, and observed "a male subject that was sitting in the passenger's side of the vehicle. And he was kind of tilted back with his head on the passenger door window." *Id.* at 9; Ex. FF(4) (Tr.) at 1280. Officer Loconsole testified that he "assumed that since the person didn't move that he was either asleep or he was intoxicated and pulled off the road," so he decided to "let him sleep for a couple of hours and come back later and check on him." Nov. 10, 2003 Op. at 9. Officer Loconsole returned at approximately 2:30 a.m. *Id.* at 12. The car was still running and the music was still playing. *Id.* Officer Loconsole shined a light into the car and noticed that the male subject had not changed position and observed "what appeared to be a trickle of blood that had come from the right nostril of the subject down his right cheek." *Id.*; Ex. FF(4) at 1281. Loconsole called for an ambulance. Nov. 10, 2003 Op. at 9.

***January 10, 1996—The Morning After:*** At 8:00 a.m. the following morning, Thivel awoke Murray in their apartment. *Id.* at 14. Murray testified that Thivel said, "Remember that thing I was talking about? Well, I did it." *Id.* Murray testified that he understood Thivel to be

---

[7] David Mayer testified that when he was driving home between 11:50 and 11:55 p.m., he saw a "smaller car, reddish" with its taillights on parked on Prairie, 30 to 40 feet from Potter. Nov. 10, 2003 Op. at 8. Kim Whenut, who lived next door to 680 Potter at the time, testified that she was awakened at about 1:00 a.m. by a "loud bang. One noise." She did not see anything from her window so she went back to sleep. *Id.* at 9.

confessing that "he had done something to Robert Farberger." *Id.*[8] Murray asked Thivel if there would be police, and Thivel confirmed and told Murray to tell the police that Thivel "was here all night; and that [Murray] had taken a phone call at about 12:30 in the evening – or, 12:30 a.m., somewhere around that area, that he was here for that phone call … I believe from his brother … He showed me on the caller ID there was a phone call." *Id.*; Ex. FF(4) (Tr.) at 1184-85.[9] Thivel also told Murray that Thivel had borrowed Murray's van "to start his brother's car, and he put gas in it;" Murray confirmed that $10 of gas appeared to be added to the gas gauge. *Id.* at 14-15; Ex. FF(4) (Tr.) at 1185. Murray moved out of the apartment he shared with Thivel that day because of what Thivel told him. Nov. 10, 2003 Op. at 15; Ex. FF(4) (Tr.) at 1186.

At about 7:25 a.m. on January 10, 1996, Raphael Tovar, a detective for the Des Plaines Police Department, awoke the residents of 680 Potter (recall that footprints led from the car to the driveway of this house) and transported them to the police station. Nov. 10, 2003 Op. at 50. Also at some point that morning, Sergeant Rozhuszka and five other officers went to Thivel's apartment, obtained Thivel's signature on a consent-to-search form, and then searched the apartment.[10] *Id.* at 49. The officers found a box of 9 millimeter ammunition, containing five live rounds and one spent round, a Teflon-coated .38 special Winchester caliber round, four bags of cannabis, a holster, a Polaroid photograph of Thivel, and some clothes Thivel said he had worn the night before. *Id.* at 49-50. Sergeant Rozhuszka testified that Thivel voluntarily accompanied

---

[8] On cross examination, Murray acknowledged that he did not tell the police about this statement in 1996, and that he first mentioned the statement just before his grand jury testimony three years later. Ex. FF(4) (Tr.) at 1232, 1234.

[9] Testimony at trial indicated that a phone call occurred at 12:30 a.m. on Thivel and Murray's home phone and that the call lasted for six minutes. Ex. FF(4) (Tr.) at 1227.

[10] The record as provided to the Court does not indicate what information the police obtained that morning that prompted them to go to Thivel's apartment, but that question is not material to the Court's analysis.

the police to the station, arriving at 1:30 p.m. *Id.* at 50, 54. Murray was also interviewed and told the police the story Thivel had instructed him to tell, Nov. 10, 2003 Op. at 15; Ex. FF(4) (Tr.) at 1186, but later testified at trial that he could not remember the 12:30 a.m. phone call. Nov. 10, 2003 Op. at 15.

***Thivel's Alibi Defense:*** Jeffrey Thivel, the defendant's brother, testified at trial that he arrived at home (his mother's house at 8853C Robin Drive in Des Plaines) from work—he believed he worked at Dominick's at the time—at 10:00 p.m. on January 9, 1996. *Id.* at 19-20. He watched television, ate, and then "decided that [he] wanted to get a jump for [his] car," which was a 1998 Nissan 200SX that was having battery problems. *Id.* at 20. He testified that he made several phone calls to get a jump for his car in the morning, including to Milici (he left a voicemail) and to 680 Potter. *Id.* Jeffrey spoke to someone who he believed was Johansen at 680 Potter, and then called his brother James' apartment at 12:30 a.m. *Id.* at 20. According to Jeffrey, Murray answered and gave the phone to James; Jeffrey and James spoke for about five minutes (telephone records introduced at trial confirm that the call lasted six minutes); Jeffrey asked if James "could come over in the morning and give [Jeffrey] a jump." *Id.* Jeffrey testified that it sounded as if his brother had been drinking and "that there was partying going on." *Id.;* Ex. FF(5) (Tr.) at 1663. After he hung up, Jeffrey got ready for bed and made some calls to a couple of towing companies "to get information" in case James decided not to show up. Nov. 10, 2003 Op. at 20. Jeffrey stated that he did not make arrangements for a tow truck to come that night and went to bed after making the calls. *Id.* James called Jeffrey at approximately 6:00 a.m. and came over at 7:00 a.m. to jump Jeffrey's car. *Id.* at 20-21. James was driving Murray's van that morning. *Id.*

Other witnesses testified, however, that James—not Jeffrey—made the post-midnight calls from his mother's house. Milici testified that James left a voicemail after midnight on January 10; Milici then gave a tape recording to the police of what he represented to be the voicemail and which he believed would provide Thivel with an alibi.[11] *Id.* at 15; Ex. FF(3) at 953-54. Thivel's expert at trial, however, opined that the recording was not authentic. Nov. 10, 2003 Op. at 15. The State did not contest that opinion. *Id.*[12] Johansen testified that after midnight, Thivel called 680 Potter and informed Johansen that he would not be coming over as planned. *Id.* at 14. On cross-examination, Jeffrey admitted that he told the grand jury that it was possible that James was at their mother's house and made a call from there on January 9. *Id.* at 21. The payroll administration manager for Dominick's also testified in rebuttal for the State that employee records and time cards reflected that Jeffrey did not begin working at Dominick's until January 13, 1996. *Id.*

**January 12, 1996**: On January 12, Milici and James drove together to a Montgomery Ward's store where Jeffrey was getting a new battery installed in his 8008 Nissan X200 two-door hatchback. *Id.* at 15. Milici testified that he overheard James ask his brother repeatedly for the keys to their mother's house; Jeffrey refused to give him the keys. *Id.* Milici testified that as

---

[11] Milici testified that he made the recording of the message "days later" because he "believed that the time stamp in conjunction with what I had read in the paper was the time of death and where I had assumed that he was calling me from would place him at a distance from the crime scene." Ex. FF(3) (Tr.) at 955. Milici also testified that Thivel "absolutely [did] not" ask him to save the message. Ex. FF(4) (Tr.) at 1042. Milici did not remember the contents of the voice message, and the message was not played at trial. *Id.* at 1053. He added that he made the recording when a sergeant and police officer were on their way to pick him up for an additional interview, and that he played it for them in their car. *Id.* at 1013, 1053.

[12] Milici also testified that "The modifications to the tape recording had been made previously because it was common for me to make recordings of telephone conversations …." Ex. FF(4) (Tr.) at 1025. He also explained that he would attach a tape recorder to his telephone line with alligator clips on the phone line's "service entry" in his house. *Id.* at 1025-26.

he and James walked around the store, James "said under his breath, my f***ing brother, he'd help me get away with murder but he wouldn't give me the keys to the house." *Id.* Jeffrey, however, testified that he never heard James make that statement or ask him for the keys to their mother's house. *Id.* at 21; Ex. FF(5) (Tr.) at 1671.

Later that same day, Thivel and Jeffrey went to Murray's family's home. Nov. 10, 2003 Op. at 16. Murray testified that, in front of Murray's family, "[James] said that no matter how bad it looks, that he was innocent, he didn't do it." *Id.*; Ex. FF(4) (Tr.) at 1195. Murray added that James and Murray then spoke alone in the stairwell, and Murray told James "that I had brought the girls into it. I told him about the two girls." Thivel was "upset by that, but he said he could deal with it." Nov. 10, 2003 Op. at 16. Thivel added that "the least amount of people that knew he did it, the better off he would be." *Id.* On cross, Murray admitted that he did not initially tell the police about Thivel's comments in the stairwell and that although he thought he mentioned the statements in an interview before his grand jury testimony, he did not testify about the statements before the grand jury. Ex. FF(4) at 1244-45, 1248-49. Jeffrey, on the other hand, testified that he was with James the entire time they were at Murray's house. Nov. 10, 2003 Op. at 21.

***Ballistics and Firearm Evidence***: Forensic evidence indicated that six 380 auto caliber bullets were recovered from the victims' bodies. *Id.* at 3. Four of the bullets recovered were fired from the same gun. *Id.* The other two bullets had the same class characteristics as the first four, but it could not be determined (based on examination of the bullets themselves) whether they had been fired from the same weapon. *Id.* A firearm examiner for the Illinois State Police testified that the seven casings found at the scene were all fired from the same firearm. *Id.* at 3-4. While all of the bullets were 380 auto caliber, some of them had different configurations, indicating that

they were different types of ammunition. *Id.* The casings were also from different sources, some manufactured by Winchester and others by Federal. *Id.* at 3-4. A receipt located in the glove box of the victims' vehicle showed a purchase of a box of 50 Winchester 380 automatic 94 Grade, full metal, copper bullets. *Id.* at 4.[13] The State's firearm examiner testified that the bullets recovered from the victims could have been fired from a Walther PPK or Walther PP 380 auto caliber or a 32 auto caliber weapon. *Id.* at 12. [14]

Stryjak testified that in September 1995, Thivel showed him a black handgun while the two were serving as security guards for a party at 680 Potter. *Id.* at 12-13; Ex. FF(4) (Tr.) at 1344. Thivel described the gun as a "Walther PK." *Id.* at 12-13. Milici testified that he and Thivel went to a shooting range on occasion, and that Thivel brought "[a] couple of different 357s and a couple of different 9 millimeters, a 380 I think at one point, a 38 and a 25." Nov. 10, 2003 Op. at 13; Ex. FF(3) (Tr.) at 944. Thivel and Milici would sometimes "vary ammunition and sometimes vary powder strengths from ammunition to try to achieve greater target accuracy." Nov. 10, 2003 Op. at 13; Ex. FF(3) (Tr.) at 948. In other words, Milici explained, "[t]he magazine would be loaded with more than one type of ammunition." Nov. 10, 2003 Op. at 13.

Milici also testified that Thivel bought the 380—a Walther PPK that could hold up to eight shots—for $10 from a teenager who, in turn, found the gun and a nylon holster while breaking into cars. *Id.* Milici cleaned the gun and holster for Thivel. *Id.* Although Thivel promised to give the 380 to Milici, Milici did not see the gun for at least a month or two before

---

[13] Three knives and a paintball were found on Farberger's person. *Id.* Nov. 10, 2003 op. at 47.

[14] The autopsy reports, which were stipulated to at trial, reflected a total of nine gunshot wounds to the victims (five to Caudell, and four to Farberger), but only six bullets and seven casings were recovered from the victims' bodies and the scene. Ex. FF(4) (Tr.) at 1297-1304.

Farberger and Caudell's deaths. *Id.* During a search of Thivel's apartment on January 10, 1996, police recovered a black nylon Bianchi Ranger holster, which could accommodate a Walther PPK or PP, from a locked toolbox in Thivel's bedroom. *Id.* The weapon used to shoot Farberger and Caudell was not recovered. Ex. FF(4) at 1316.

*Fingerprints:* The parties stipulated at trial that an expert received latent fingerprints lifted from the vehicle where Farberger and Caudell's bodies were found and that none of the prints matched Farberger, Caudell, or Thivel.[15] *People v. Thivel*, No. 1-11-2189 (Ill. App. Ct. Nov. 21, 2012) at 2 (Dkt. 17, State's Ex. I). Detective George Fortier testified at trial that he obtained two latent fingerprints from the exterior of the vehicle's right rear door, and nine latent fingerprints from the interior of the vehicle's right rear door, all of which Detective Fortier placed into evidence. Ex. FF(3) at 731-34.

*Shoeprints and tiretracks*: According to a sergeant's testimony at trial, at least a couple hundred shoe prints were found in the light snow surrounding the victims' vehicle. Nov. 10, 2003 Op. at 4; Ex. FF(4) (Tr.) at 1481-82.[16] A sample of urine taken from the snow nearby was contaminated, and so DNA testing was not possible. Nov. 10, 2003 Op. at 4. And although prints led away from the car into the front yard of 680 Potter, they did not appear to lead into the house;

---

[15] The State raises in its motion to dismiss before this Court that Thivel requested fingerprint analysis pursuant to 725 ILCS 5/116-3 (amended in Public Act 98-948, S.B. 2995, 2014 Ill. Legis. Serv. P.A. 98-948, August 15, 2014) in his successive post-conviction petition in state court. According to Thivel's brief appealing the denial of his fingerprint motion, Thivel requested that a certain number of fingerprints—which were found in the victims' car and that the parties stipulated at trial did not match either of the victims or Thivel—should be run through the FBI's Integrated Automated Fingerprint Identification System (AFIS). Dkt. 24, Ex. Z, at 7, 18. Thivel does not raise this claim or request as part of his federal habeas petition, so it is not now before this Court.

[16] At a pre-trial suppression hearing, Sergeant Rozhuszka of the Des Plaines Police Department testified that when he was called to the scene at 6:50 a.m. on January 10, 1996, he observed foot prints and found paint balls. Nov. 10, 2003 op. at 47; July 24, 2000 Tr. at 11-12 (paint balls were found in front of 680 Potter and in Farberger's pocket).

further, no shoes were found in the house that were consistent with the footprints. *Id.* Testimony indicated, however, that the tire tracks next to the prints found on a nearby bridge matched the tires on the victims' car. *Id.*

Detective Tovar testified that during the search of Thivel's apartment he found a Polaroid photograph of Thivel and Richard Farberger, the victim's twin brother, and that in the photograph, Thivel wore a pair of hiking boots that the police did not recover from his home. *Id.* at 18; Ex. FF(3) (Tr.) at 652. Detective Tovar contacted a shoe store, E.S. Originals, and identified the Oak Harbor boot, which he believed were the same boots as the boots worn by Thivel in the Polaroid photograph. Nov. 10, 2003 Op. at 18. Tovar then obtained a sample of the boot that was most likely a size 8 or 8 ½. *Id.*; Ex. FF(4) (Tr.) at 1464. The State introduced the boot and photographs of the shoe prints during its case in chief, but did not provide any expert testimony regarding whether the boot could have made the shoe prints at the crime scene.[17] Nov. 10, 2003 Op. at 18. Thivel's expert testified that the crime scene photographs of the shoe prints were not taken according to proper procedure, that the Oak Harbor boot could not have made the shoe prints at the scene, and that the print in the snow was likely a size 6 ½ or 7. *Id.* at 18-19. He also identified several shoes found in Thivel's apartment as ranging in size from 8 ½ to 9. *Id.* at 19.

---

[17] The defense called to testify a sales representative for E.S. Originals, Mike Anderson. Nov. 10, 2003 op. at 40; Ex. FF(4) (Tr.) at 1457. Anderson described how he identified the Oak Harbor boot as the boot he believed was in the Polaroid photograph and consequently the boot that appeared to him to have the same sole "as the shoe print in the snow." *Id.* at 40-41. He added, "The Sears shoe helped me to contact my New York office … And they sent me this shoe. And based upon the sole print of the Sears shoe is identical to this one – by the transitive property of a quality … that A and B equals C, you know … Yes, [it appear[ed] to have the same outer sole as the shoe print in the snow]." Nov. 10, 2003 Op. at 41; Ex. FF(4) (Tr.) at 1472-75. Anderson was not qualified at trial as a shoe print expert. Nov. 10, 2003 Op. at 42.

The State's experts testified in rebuttal that the Oak Harbor boot and the shoe worn by Thivel in the Polaroid photograph shared common class characteristics and that the Oak Harbor boot could have made the shoe prints in the snow.[18] *Id.* The State's experts also testified that they could not determine an accurate size of the shoe that made the prints in the snow because a curved metal scale and unidentifiable angles in some photographs made an accurate measurement impossible, and because snow impressions are inherently difficult to measure. *Id.*

***Oregon***: At some point during 1996, Thivel moved to Oregon. Misty Wilson, Thivel's girlfriend for much of the time he lived in Oregon, testified that Thivel moved there to "move away from trouble … start over and let everything kind of calm down." *Id.* at 16; Ex. FF(4) (Tr.) at 1076. Thivel met Wilson in November 1996; he moved in with her in 1998 and they lived together for six to nine months thereafter. Nov. 10, 2003 Op. at 16.

Wilson testified that Thivel made the following statements while they were living together:

- While watching a "cop" show on television, Thivel stated, "Oh, I did that. And it wouldn't work that way." When Wilson looked up "a few seconds later," she saw two people on the television "getting killed in their face [sic]." Wilson added that she didn't know what Thivel was talking about because she did not know what was on the television screen at the moment of Thivel's statement.

- Thivel stated that "if a friend screwed him over, [h]e would screw them over too. And he would make sure that it was in such a way that nobody would be able to find out how it was done."

---

[18] The State's experts did not, and could not, testify that the tracks were made by Thivel's boots, since they did not have the boots and because, as the National Research Council of the National Academies concluded in a 2009 report, "Regardless of the type of impression evidence, class characteristics are not sufficient to conclude that any one particular shoe or tire made the impression. That latter step—which is not always possible—requires comparison of the individual identifying characteristics on the impression evidence with those on a shoe or tire that is suspected of leaving the impression." *See* National Research Council, *Strengthening Forensic Science in the United States: A Path Forward*, Washington, DC: The National Academies Press, 2009.

- Thivel stated that "if he was going to commit a crime, it would be somewhere dark where there wasn't anybody to watch."

- Thivel stated that "if he were going to commit a crime, he would arrange his own – he would get himself there. He would not rely on other people."

- Thivel stated that "the best way to kill anybody is to shoot them in the head … He said it was the best way to do it. He didn't say that he would do it … He was standing up at the time. And he just pointed his finger out and angled it down."

- Thivel stated that "if, you know, you are killing two people, one person has time to react and can create a harder target."

- Wilson testified that in reference to a gun used in the commission of a crime, Thivel stated, "Never throw it under water. And in another conversation he did vaguely mention dismantling a gun and spreading the pieces might work."

- Thivel stated that if he committed a crime, "his family would help him. He didn't say he would go anywhere specific … [His mom] was willing to pretty much help him out in any way that she possibly could ..."

*Id.* at 16-17; Ex. FF(4) (Tr.) at 1065, 1071-75, 1099. Wilson also testified that Thivel demonstrated to Wilson how he would shoot someone; Wilson mimed for the jury, "right arm out, with her forefinger outstretched; the other arm in a downward slant." Nov. 10, 2003 Op. at 17.

Wilson testified that she became concerned about Thivel, in part because of what Thivel said "about his past" and because of "certain things he had said about his sister." *Id.* at 17-18. Wilson explained that Thivel had a dispute with his sister about her keeping some family inheritance money and that he was so angry at her that he said he was going to plant drugs in his sister's car to ruin her legal career. Ex. FF(4) (Tr.) at 1088-89. Wilson also testified that Thivel was "kind of a control person," so she made him move out of the apartment. Nov. 10, 2003 Op. at 17-18. After Thivel moved out, Wilson had her car searched because she was afraid he might have planted drugs there. *Id.* at 18.

Kylee Hawes Mendoza testified that she lived with Wilson for four months and Thivel for one month in Oregon. Ex. FF(4) (Tr.) at 1262. She witnessed regular "screaming matches" between Wilson and Thivel, lasting from 20 to 60 minutes each. *Id.* Mendoza added that most of the screaming came from Wilson, that Wilson never told her that Thivel was discussing killing people, and that Wilson had a reputation at work for not being "exactly honest. That she tended to exaggerate things." *Id.* at 1265-66. Mendoza also testified that Wilson and she referred to Thivel as "Crazy Jim" because he did not act like a normal person and that he had "kind of a creepy demeanor." *Id.* at 1267-68.

## II. PROCEDURAL HISTORY

In October 1999, Thivel was arrested and charged with Farberger and Caudell's murders. On April 18, 2001, a jury found him guilty. He was sentenced to natural life imprisonment.

On direct appeal, Thivel argued that the evidence at trial was insufficient to sustain his conviction, various errors denied him a fair trial, the trial court erred in denying his motion to suppress based on an allegedly illegal search of his bedroom and seizure of certain items, and ineffective assistance of counsel. The Court of Appeals affirmed Thivel's conviction and sentence on November 10, 2003. *People v. Thivel*, No. 1-01-2905 (Nov. 10, 2003). The Supreme Court denied Thivel's petition for leave to appeal. *People v. Thivel*, No. 97723 (Mar. 24, 2004).

In September 2004, Thivel filed a *pro se* post-conviction petition. He amended the petition in November 2004 and argued that (1) his appellate counsel was ineffective for failing to raise claims of trial counsel's ineffective assistance on direct appeal; (2) he had new evidence that Wilson's testimony was taken out of context and that he never made incriminating statements to her; (3) his trial counsel was ineffective for failing to cross-examine Felkel, the tow truck driver, about his motive to falsely accuse Thivel; and (4) his trial counsel was ineffective

for failing to assert that the entry and search of his apartment lacked a warrant and probable cause. The trial court summarily dismissed the petition; the dismissal was affirmed on appeal. *People v. Thivel*, No. 1-05-0590 (Sept. 18, 2006). The Illinois Supreme Court denied Thivel's petition for leave to appeal on November 29, 2006. *People v. Thivel*, No. 103546 (Nov. 29, 2006). The Illinois Supreme Court then directed the Illinois Appellate Court to vacate and reconsider its judgment based on new case law, but the Illinois Appellate Court affirmed again on May 7, 2010.[19] The Illinois Supreme Court denied the petition for leave to appeal on September 29, 2010.

In February 2011, Thivel filed a *pro se* motion for leave to file a successive post-conviction petition, arguing that his petition presented a claim of newly discovered evidence. In the petition, Thivel claimed that the State failed to correct perjured testimony at trial, knowingly used perjured testimony, and, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), failed to disclose a deal made with Dan Stryjak in exchange for his testimony. Thivel also claimed that (1) the trial court abused its discretion when it limited the cross-examination of two key witnesses as to bias, interest and motive to testify falsely; (2) appellate counsel was ineffective for failing to raise the limitation of cross-examination; and (3) unidentified fingerprints found at the crime scene should be tested. In June 2011, the trial court denied the motion for leave to file the

---

[19] After Thivel filed his motion for leave to file a motion for reconsideration with the Illinois Supreme Court on December 29, 2006, the Illinois Appellate Court was directed to vacate its September 18, 2006 judgment and reconsider that judgment in light of *People v. Hodges*, 234 Ill. 2d 1 (2009), in which the Illinois Supreme Court held that "a *pro se* petition seeking postconviction relief … for a denial of constitutional rights may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *Id.* at 11–12. The *Hodges* court defined such a petition as one which is "based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. The Illinois Appellate Court vacated its previous order as directed, but then issued a second decision affirming the denial of Thivel's petition. *People v. Thivel*, No. 1-05-0590 (May 7, 2010).

successive post-conviction petition and dismissed the petition. The Illinois Appellate Court affirmed. *People v. Thivel*, No. 99 CR 21313 (Nov. 21, 2012). The Illinois Supreme Court denied the petition for leave to appeal. *People v. Thivel*, No. 115397 (Mar. 27, 2013).

On August 19, 2013, Thivel filed a *pro se* petition for a writ of habeas corpus in this court pursuant to 28 U.S.C. § 2254. He raised one claim in that petition: the State deprived him of due process by failing to disclose information favorable to him (an offer of leniency for Dan Stryjak, who was facing drug charges) and failing to correct perjured testimony—specifically, Stryjak's testimony that the charges had been "dropped," when he was actually obligated to attend "drug school" instead. The State moves to dismiss Thivel's petition as untimely.

## III.    DISCUSSION

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. AEDPA allows this Court to grant a petition for a writ of habeas corpus by a state prisoner only on the ground that he is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). AEDPA provides that a one-year period of limitation shall apply to a habeas petition by a person in custody pursuant to a state court judgment. 28 U.S.C. § 2244(d)(1). The statute of limitations begins to run from the latest of (1) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (2) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the application was prevented from being filed by such State action; (3) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the factual predicate of the claim or claims presented could have been discovered

through the exercise of due diligence. *Id.* AEDPA further provides that the time during which a properly filed application for state post-conviction relief or other collateral review is pending shall not be counted toward the one-year limitation period. 28 U.S.C. § 2244(d)(2).

### A. Thivel's Petition is Untimely.

On October 4, 2004, Thivel's judgment became final when the United States Supreme Court denied his petition for a writ of certiorari at the end of his direct appeal. *Thivel v. Illinois*, 543 U.S. 856 (2004). In September 2004, Thivel filed a state post-conviction petition which had the effect of tolling the one-year statute of limitations that began on October 4, 2004. 28 U.S.C. § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."). Thivel's post-conviction petition remained pending until September 29, 2010, when the Illinois Supreme Court denied Thivel's petition for leave to appeal. *People v. Thivel*, No. 110621 (Sept. 29, 2010). Thivel did not file a petition for writ of certiorari in the United States Supreme Court, but that fact is irrelevant since a petition for a writ of certiorari filed after state post-conviction review does not have the effect of tolling the statute of limitations. *See Taylor v. Michael*, 724 F.3d 806, 808 (7th Cir. 2013). In sum, the limitations period ceased tolling on September 29, 2010, and the one-year statute of limitations began to run the following day. Since Thivel did not file his federal habeas petition until August 19, 2013,[20] his petition is untimely.

---

[20] Thivel's federal habeas petition is dated July 16, 2013, but it was not filed on this Court's docket until August 19, 2013; the envelope in which it was mailed bears a postmark dated August 15, 2013. Presumably the former date controls, *see Jones v. Bertrand*, 171 F.3d 499, 502 (7th Cir. 1999) (a habeas petition is deemed filed when given to the proper prison authorities and not when received by the district court clerk), but it is not necessary to make that determination here. Even counting from the July 16, 2013, date, Thivel's habeas petition was filed more than one year after September 30, 2010.

**1. Thivel's motion for leave to file a successive post-conviction petition in February 2011 did not toll the statute of limitations.**

In February 2011, Thivel filed a motion for leave to file a successive post-conviction petition, raising for the first time his claim that Dan Stryjak had an undisclosed deal with the State in exchange for his testimony at trial, that Stryjak perjured himself, and that the State failed to correct Stryjak's testimony, about that deal.[21] Thivel also made a request for fingerprint analysis of one or more fingerprints found in the victims' car that the parties stipulated at trial did not match the victims' or Thivel's fingerprints.

The Seventh Circuit has "clearly held that where state law requires pre-filing authorization—such as an application for permission to file a successive petition—simply taking steps to fulfill this requirement does not toll the statute of limitations." *Martinez v. Jones*, 556 F.3d 637, 638 (7th Cir. 2009) (citing *Tinker v. Hanks*, 255 F.3d 444, 445-46 (7th Cir. 2001)). The Seventh Circuit continued, "[T]he second petition tolls the limitations period only if the state court grants permission to file it." *Id.* at 638-39. Thivel never obtained permission to file his successive post-conviction petition; rather, at each stage of his second collateral attack, the state courts denied his attempt to secure permission to file the successive petition.

It is possible that Thivel believed that by attempting to file a second post-conviction petition in state court in February 2011, he would begin the tolling of the statute of limitations once again (after the statute of limitations began to run on September 30, 2010). A mistaken

---

[21] The Respondent has been unable to locate Thivel's February 2011 *pro se* motion for leave to file a successive post-conviction petition, or the circuit court's denial of that motion. However, the Respondent did submit Thivel's July 11, 2012, brief (in which he was represented by counsel from the Illinois Appellate Defender) appealing to the Illinois Appellate Court after the denial of his motion in the trial court. Dkt. 24, Ex. Z. That brief describes Thivel's February 2011 motion, although the attached exhibits, including the motion, are not included in the record before this Court. *Id.* at A-1.

understanding of the running of the statute of limitations, however, does not result in tolling. *See Arrieta v. Battaglia*, 461 F.3d 861, 867 (7th Cir. 2006) ("Mistakes of law or ignorance of proper legal procedures are not extraordinary circumstances warranting invocation of the doctrine of equitable tolling."); *see also Williams v. Sims*, 390 F.3d 958, 963 (7th Cir. 2004) ("even reasonable mistakes of law are not a basis for equitable tolling. This is the general rule and it has been applied repeatedly to pro se habeas corpus petitioners"). A habeas petitioner is entitled to equitable tolling only if he shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010). Thivel makes no such argument.

### 2. Thivel's untimeliness is also not excused by discovery of the factual predicate for his claim in February 2011.

At the latest, Thivel discovered Stryjak's allegedly undisclosed deal with the State by February 2011, when he filed his first motion for leave to file a successive post-conviction petition in the state trial court. He writes in his habeas petition that the evidence was discovered after his trial, his direct appeal, and his first round of post-conviction review and that he "raised these claims in State Court as soon as was possible …" Dkt. 1, Pet. at 7. The Court has considerable doubt regarding this statement; as discussed in more detail below, Thivel's attorney stated at trial that he had in his possession Stryjak's case sheet indicating an upcoming, April 30 court date and referring to "drug school." Dkt. 24, Ex. K at 152-53. Regardless, if Thivel knew about the allegedly undisclosed deal and about Stryjak's allegedly perjured testimony in February 2011, when he first raised the issue with any court, the statute of limitations would begin running from that date. 28 U.S.C. § 2244(d)(1)(D). When Thivel filed his federal habeas petition on August 19, 2013, more than one year had passed since February 2011. Thus, the discovery of the factual predicate for his claim does not excuse Thivel's untimeliness.

### 3. Thivel's untimeliness is not excused by a claim for actual innocence.

A petitioner can obtain review of the merits of his defaulted claim in federal court if he can establish that a fundamental miscarriage of justice would result from the denial of his petition because the petitioner is actually innocent. *See House v. Bell*, 547 U.S. 518, 536-37 (2006). In 2013, the U.S. Supreme Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass … [to excuse] the expiration of the statute of limitations." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). "[T]enable actual-innocence gateway pleas are rare: [A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 1928 (citation and internal quotation marks omitted). To be credible, a claim of actual innocence "requires a petitioner to support his allegations of constitutional error with *new* reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup v. Delo*, 513 U.S. 298, 324 (1995) (emphasis added); *House*, 547 U.S. at 537.

When assessing the adequacy of an actual innocence claim to overcome procedural default, "the habeas court must consider all the evidence, old and new, incriminating and exculpatory" and then "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Coleman v. Lemke*, 739 F.3d 342, 349 (7th Cir. 2014). Absolute certainty about guilt or innocence is not required to satisfy the burden at the gateway stage. *House*, 547 U.S. at 538. Further, the proper inquiry is not whether a particular juror would have the power to convict in light of the old and new evidence, but rather "how reasonable jurors would react to the overall, newly supplemented record" and whether it is "more likely than not that any reasonable juror would have reasonable doubt" about the defendant's guilt. *Id.*

To be clear, "actual innocence" is not itself a constitutional claim. Rather, it is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). The Supreme Court "has not resolved whether a prisoner may be entitled to habeas relief based on a freestanding actual-innocence claim …." *McQuiggin*, 133 S. Ct. at 1926. Rather, the purpose of the actual innocence gateway is to "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case … Sensitivity to the injustice of incarcerating an innocent individual should not abate when the impediment is AEDPA's statute of limitations." *Id.*, 133 S. Ct. at 1926.

### a. Thivel claims actual innocence.

The threshold question that this Court must address is whether Thivel has made an actual innocence claim. *See, e.g., Awon v. United States,* 308 F.3d 133, 143 (1st Cir. 2002) (actual innocence claim forfeited where not raised in petition). The answer to that question is yes. Thivel asserts several times in his habeas petition and in a separate submission to the court ("Letter to Assistant General Malamuth: Request and Proposal for Settlement," Dkt. 29 (Apr. 28, 2014)) that he is innocent of the murders of Farberger and Caudell.

In his habeas petition, Thivel wrote,

> There was no eyewitness to the crime. There was no DNA, hairs, fibers, or physical evidence linked directly to Mr. Thivel. There was no weapon recovered. There was no confession to the crime. There were no fingerprints of Mr. Thivel's at the scene. Two unidentified fingerprints recovered from the crime scene were not submitted for comparison to AIFIS. Mr. Thivel filed a post conviction motion with this current issue to have the prints submitted. The State refused to submit the unidentified prints to the FBI's Integrated Automated Fingerprint Identification System (AIFIS). And, Mr. Thivel had an alibi showing he was at home, 12 miles away, around the time of the crime. Mr. Thivel was on the

phone at his apartment. This was proven by phone records and
witness testimony.

*Id.* at 14-15. In his separately filed Letter, Thivel wrote, "I have spent the last 15 years in prison

for a crime I did not commit." He added, "a fundamental truth that I know … is I did not commit

this crime … I did not commit any murders." *Id.* at 5, 7.

It is clear to the Court that Thivel argues his actual innocence. Although he does not

directly connect that argument to excusing his untimeliness, a court must construe a *pro se*

petition liberally. *See Ward v. Jenkins,* 613 F.3d 692, 697 (7th Cir. 2010). The Court will

therefore construe Thivel's arguments regarding his actual innocence to be an attempt to excuse

his untimely petition.

**b. Thivel does not offer "new evidence" to support a credible
claim of actual innocence.**

The second question the Court must address is whether Thivel has offered "new"

evidence that is sufficient to make a credible claim for actual innocence. To be credible, a claim

of actual innocence "requires a petitioner to support his allegations of constitutional error with

new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness

accounts, or critical physical evidence." *Schlup*, 513 U.S. at 324.

Thivel's "new" evidence is that the State had a deal with Dan Stryjak in exchange for his

testimony at Thivel's trial, that the State failed to disclose this deal to the defense before or even

during trial, and that the State failed to correct Stryjak's perjured testimony about the deal. After

reviewing the trial testimony and documents in the record on this topic, however, it is evident

that the information on which Thivel bases his arguments was actually known to the defense at

trial; in other words, the evidence is not "new."

On cross examination by Thivel's attorney, Gary Johnson, Stryjak testified that he did not "horse around" with selling drugs. Ex. FF (Tr.) at 1363. Johnson then asked Stryjak whether he had a charge pending in Cook County, to which Stryjak responded affirmatively. *Id.* at 1363-64. The State objected and a sidebar was held, during which Mr. Johnson advised the trial judge that Stryjak "currently has pending in this very courthouse an unlawful possession of a controlled substance charge against him. His next court date is April 30." *Id.* at 1364-65. He added that Stryjak was charged with unlawful possession of a controlled substance and that he could "think of no more than a classic definition of bias that he's testifying for the State and the State currently has charges." *Id.* at 1365. The State explained that its objection had been predicated on the fact that Stryjak testified that he did not sell drugs, not that he did not use them, and that the unadjudicated pending possession charge was not impeaching of Stryjak's testimony. The State conceded, however, that Johnson could inquire into pending charges as evidence of potential bias:

> Now he's going to argue to the jury that he lied about that, that he's horsing around with it … He can consider whether for bias as a witness, but he can't consider it now to conclude that he's horsing around with marijuana or other drugs because he hasn't been convicted of it … And the pending case is not admissible unless it's being used to show that the State has made some kind of deal regarding that case.

*Id.* at 1365-67. The trial court judge then asked counsel when Stryjak had been arrested on the charges, to which Mr. Johnson responded, "I'd have to look at the sheet, Judge." *Id.* at 1366. The state's attorney then added:

> [W]e agree that he can get into this arrest because now this witness does have a motive to be testifying for the State. Okay. We agree … Since he's presented a motive now, so we have no objection to that. We think he can get into that.

*Id.* at 1367-68. The court then stated, "I think you can ask him if he anticipates leniency from the State in terms for his testimony as well." *Id.* at 1368. Returning to open court, Mr. Johnson asked Stryjak,

> Q: That case you currently have pending in this county, an unlawful possession of a controlled substance case, is that correct?
>
> Stryjak: Yes. The charges have been dropped.
>
> Johnson: They have been dropped?
>
> Stryjak: Yes.

*Id.* at 1369.

Mr. Johnson then moved on to other questions. Later in the day, outside the presence of the jury, the State informed the court that "since Mr. Johnson has said to this witness has [sic] a motive to be fabricating, had a case pending … I believe at the time because Mr. Johnson represented that, however, Mr. Johnson was wrong because the case has been dismissed." *Id.* at 1389. Mr. Johnson responded, "I have paper showing it has an April 30 court date." *Id.* The trial judge asked whether Mr. Johnson had shared the document with the State,[22] to which Mr. Johnson replied, "It's not a statement of a witness. It's not discoverable. I have it." *Id.* at 1389. The prosecutor indicated that he was unaware of the document. *Id.* at 1390. As far as this Court can see, that was the last communication on the record about Stryjak's deal, or potential deal, with the State, with the exception of Mr. Johnson's closing argument, in which he argued, "Dan Stryjak … [c]omes to the witness stand, after just having charges, drug charges dropped by this very office, and tells you things that are not to be believed." Dkt. 24, Ex. K (Tr.) at 152-153.

---

[22] The transcript attributes this question to the state's attorney, but it only makes sense if it was asked by the court.

The document Mr. Johnson refers to appears to be the docket sheet that Thivel attaches to his habeas petition. The document is from the case file of *Des Plaines v. Stryjak, Daniel C.* for a 2000 prosecution of unlawful possession of a controlled substance and possession of cannabis. An entry on December 13, 2000, states: "BA 4-30-01 CBR Drug School." Dkt. 1, Ex. B. Directly above this entry, another entry on November 15, 2000, includes the notation "BA 12-13-00," which indicates to this Court that the December 13 entry reflects a next court date of April 30, 2000. Additional exhibits attached to Thivel's habeas petition suggest that Stryjak was charged for the two offenses on October 29, 2000, and that State's Attorney Bischoff gave felony approval for one of the charges; Bischoff was also one of the two state's attorneys who prosecuted Thivel at trial. *Id.*, Ex. A at 1-3.

It is plain, then, that all of the information on which Thivel bases his current argument about the impeachment potential of evidence that Stryjak cut a deal with the State was available to the defense at trial. Thivel's attorney knew about Stryjak's charges, knew that he had an upcoming court date and knew that he would likely receive, or had received, "drug school," and even had the documentation in his possession at trial to reflect this information. Mr. Johnson asked Stryjak questions about the charges in his cross-examination, elicited a response from Stryjak that the charges had been dropped, and then argued in closing that Stryjak could not be believed because he was testifying for the State right after the State dropped pending charges against him. Thivel maintains that Stryjak's testimony was false because saying the charges had been "dropped" implied that there was no deal with the State while his designation for drug school and the pending April 30 court date prove that in fact a deal had been reached. That logic

does not necessarily follow,[23] but even if Thivel's logic were unassailable, the fact remains that all of the information on which he bases that argument was known to the defense at trial. Thivel points to no "new" evidence that has surfaced since the trial that would bolster the argument; it is based entirely on information that his attorney possessed at trial.[24] Since the defense was aware at trial of all of the information on which Thivel bases his argument, that information does not constitute new evidence on which an actual innocence claim may be founded. *See McQuiggin*, 133 S. Ct. at 1936 (information "substantially available" to the defense at trial is not new evidence for the purposes of the actual innocence gateway). Thivel's "actual innocence" argument therefore fails.

Even if Thivel could successfully argue that this evidence is "new"—on the basis that Thivel's attorney was led to believe by both the State and Stryjak himself that Stryjak's charges

---

[23] The docket sheet reference to "Drug School" is too cryptic to support Thivel's contention that the State must have already reached a plea agreement with Stryjak when Stryjak testified that the charges against him had been dropped; that plainly was not the interpretation given to the document by his own attorney, who took the view that the charges remained pending and that Stryjak was due back in court on those charges on April 30. Johnson's belief that the charges remained pending, moreover, shows that the argument that Stryjak was lying about the charges being dropped was available to the defense at trial.

[24] Thivel states that he personally did not become aware of this evidence until some point during the appeal of his initial post-conviction petition in state court, but he has not claimed that he even inquired of Johnson about the objections and sidebar discussions of these issues, much less that Johnson refused to discuss them with him. In any event, evidence known to a defendant's attorney is not "new" evidence, even if it is unknown to the defendant personally. *See, e.g., United States v. Axsom,* ---F.3d---, 2014 WL 3805452, at *4 (8th Cir. 2014) (affirming denial of motion for new trial where purported "newly discovered evidence" was known at trial to the defendant's attorney, expert, and sister); *United States v. Gonzalez,* 319 F.3d 291, 297 (7th Cir. 2003) (evidence is not regarded as "suppressed" when it can be accessed before trial by the exercise of reasonable diligence, holding no *Brady* violation where defense counsel could have discovered the "new" information by carefully inspecting the evidence); *U.S. v. Payne,* 63 F.3d 1200, 1208 (2d Cir. 1995) ("evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney " 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence").

had already been dropped, when in fact the charges were apparently still pending and potentially part of a State-Stryjak deal—the evidence would still be inadequate to support an actual innocence claim—that is to say that it would not establish that "it is more likely than not that no reasonable juror would have convicted him in the light of" this evidence. *McQuiggin,* 133 S. Ct. at 1927. Indeed, Thivel's lawyer *made* the argument that Stryjak was not credible because he struck a deal with the State, but the jury convicted Thivel anyway. Johnson argued in closing that Stryjak's credibility was impaired by the fact that the State had just dropped the charges against Stryjak before he testified. The argument that Thivel asserts would have carried the day with any rational jury is only a variation on that theme; rather than conceding that the charges had been dropped before Stryjak testified, Thivel submits that an argument could have been made that a deal was still contingent on Stryjak's trial testimony. That argument is not inherently more persuasive than the argument his attorney actually made; Johnson's version of the argument could have carried more force, as it posited a bigger benefit (charges "dropped" altogether), that was delivered sooner (even before he had testified), to Stryjak; Thivel's variation posits a deal that offered a smaller benefit (having to attend drug school rather than the dismissal of the charges without any penalty) but carried with it slightly more coercive effect (no delivery of the benefit until the favorable testimony had actually been delivered). The jury heard Johnson's variation on this theme but nevertheless concluded unanimously that Thivel was guilty.

There is no basis to conclude that they were irrational in doing so, particularly given the fact that the most significant aspects of Stryjak's testimony were corroborated by other witnesses. Stryjak's testimony helped the State establish three points: (1) Thivel thought Farberger had stolen his .357 Magnum and some money; (2) Thivel was planning to exact some sort of retribution on Farberger for this theft; and (3) Thivel owned a Walther PPK handgun, a

type of gun that could have fired the rounds recovered at the scene. But Stryjak's testimony was not necessary to establish any of these points; other witnesses also provided this information. Milici testified in detail about how Thivel obtained the Walther PPK, for example, and Milici and Murray both testified that Thivel was angry with Farberger about the theft of his favorite gun. Murray testified that Thivel told him that he was going "to get" Farberger for the theft, and it was Murray who also testified that Thivel woke him up the morning after the murders to tell him that he had done "that thing," which Murray understood to mean that Thivel had followed through with his intention to retaliate against Farberger, and to instruct Murray to make certain statements to the police in order to create an alibi. That evidence (and all of the other evidence presented that did not depend on Stryjak) would have permitted a rational jury to convict Thivel even if Stryjak had been skewered more effectively about a deal with the State during his cross-examination.

The Court is required to make a "probabilistic determination about what reasonable, properly instructed jurors would do," *Coleman*, 739 F.3d at 349, in order to assess the merits of an actual innocence claim. The Court sees no basis to conclude that hearing a variation of the same argument, even if one assumes that it was marginally more compelling than the version offered by Thivel's attorney, would have made any material difference to a rational jury's assessment of Stryjak's credibility or to its evaluation of the totality of the evidence, much less that **no** rational jury could have convicted Thivel. Only "powerful" new evidence, not an alternative take on an argument already presented, suffices to establish actual innocence. *See, e.g., McDowell v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (describing the sort of "new" evidence required to establish actual innocence as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial"). The evidence

on which Thivel bases his petition, then, is neither "new" nor "powerful" and is therefore inadequate to excuse the untimely filing of his petition.

## IV. CERTIFICATE OF APPEALABILITY

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Thivel a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) in this order. A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition. Instead, he must first request a certificate of appealability. *See Miller–El v. Cockrell*, 537 U.S. 322, 335, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *Sandoval v. United States*, 574 F.3d 847, 852 (7th Cir.2009). A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller–El*, 537 U.S. at 336; 28 U.S.C. § 2253(c)(2). Under this standard, Thivel must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller–El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Here, jurists of reason would not debate the Court's conclusion that Thivel's petition is untimely and that he has not offered new evidence that would support a credible claim of actual innocence to excuse his procedural default. Therefore, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

*    *    *

For all of these reasons, the Court denies Thivel's petition for a writ of habeas corpus and declines to certify any issues for appeal. *See* 28 U.S.C. §§ 2253(c)(2), 2254(d).

Entered: September 2, 2014

_____

John J. Tharp, Jr.

United States District Judge